

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | **CASE NO. 1:06-CR-65(2)** |
| | § | |
| **OVERSEAS SHIPHOLDING GROUP,** | § | |
| **INC.** | § | |

**REPORT AND RECOMMENDATION
ON DEFENDANT OSG'S MOTION TO SUPPRESS**

Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court for the Eastern District of Texas, the District Court referred this criminal matter to the undersigned United States Magistrate for hearing and submission of findings of fact and a report and recommendation on certain case-dispositive motions. *See Order of Referral* [Clerk's doc. #70]. Pending before the Court is *Defendant Overseas Shipholding Group, Inc's Motion to Suppress Evidence Seized and Derived From September 15, 2005 Pretext Search* [Clerk's doc. #62].

    **A.**    **Background**

Pending Criminal Allegations

Defendant Kun Yun Jho (hereinafter referred to as "Jho") was employed as the Chief Engineer of the *M/T Pacific Ruby*. Defendant Overseas Shipholding Group, Inc. (hereinafter referred to as "OSG") is a corporation that owned and operated the *Pacific Ruby*, which operated

as a lightering vessel bringing bulk petroleum from other oil tankers to various ports in the Gulf Coast, including ports within the Eastern District of Texas.

A federal grand jury returned a Second Superseding Indictment [Clerk's doc. #46] against Jho and OSG on August 16, 2006. Count 1 of the Second Superseding Indictment charges that OSG and its employee and co-defendant Kun Yun Jho conspired to (1) make false and use false writings in a matter within the jurisdiction of the United States Coast Guard and the Department of Homeland Security; (2) fail to maintain an Oil Record Book for the *Pacific Ruby*; and (3) alter, conceal, cover up, falsify, or make a false entry in a record or document with the intent to impede, obstruct, or influence the investigation and proper administration of a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, all in violation of Title 18, United States Code, Section 371.

Count 2 of the Second Superseding Indictment charges Jho and OSG with making false statements in violation of Title 18, United States Code, Sections 1001(a)(3) and 2.

Counts 3 through X charge Jho and OSG with knowingly failing to maintain an Oil Record Book on eight (8) different occasions, in violation of Title 33, United States Code, Section 1908(a).

   Facts Related to the Search or Inspection

On September 21, 2006, this Court conducted an evidentiary hearing on the motion to suppress, along with several other pending motions on file in this proceeding. At the hearing, several witnesses testified and the parties presented a number of evidentiary exhibits. The Court derives the following factual recitation from the evidence presented with the motions and at the hearing.

According to the facts presented by the parties, on September 15, 2005, a crew member on

board the *M/T Pacific Ruby* contacted Coast Guard officials in Washington D.C. to report pollution violations. *See Exhibit 2 to Defendant's Motion.* He spoke with Cdr. Brad Kieserman by telephone. The crew member stated that he had reported the violation to the Coast Guard in Port Arthur, Texas and he was subsequently referred to the National Response Center which then referred him to officials in Washington, D.C. The crew member informed Kieserman that the Chief Engineer of the *Pacific Ruby* was bypassing the oily water separator (a pollution control device) and that the ship was presently located at Port Neches, Texas. He also stated that the Chief Engineer had previously ordered the crew to pump oily liquids from the bilge holding tank to the gray water tank which would allow them to discharge the liquid without passing it through the oily water separator. During the conversation, the crew member indicated that he may be concerned with his safety due to his reporting this situation. Kieserman informed the crew member that he would contact a Coast Guard agent immediately and that there would be no need to disclose why the agent inspected the ship.

Later that morning, Byron Inagaki was on duty as Assistant Chief of the Prevention and Compliance Department of the United States Coast Guard at its Marine Safety Office located in Port Arthur, Texas. *See Transcript (Tr.) of Suppression Hearing Held September 21, 2006, at p. 43.* Inagaki received two telephone calls that day, one from Coast Guard Headquarters in Washington, D.C. and the other from the Coast Guard's legal department in St. Louis. While having little specific recollection of his conversations with representatives of these two entities, Inagaki kept notes regarding the conversations.[1] *See Defendant's Exhibit #10.* Inagaki specifically

---

[1] The notes contained the names of various Coast Guard officials, and phrases such as, "high stakes settlement with DOJ", "third engineer fears for his life", and "look normal as we can through the inspection". *Defendant's Exhibit #10.*

remembered that the conversations regarded allegations concerning the discharge of oily water from the *Pacific Ruby*. *Tr., p. 53*. Inagaki also specifically remembered that he was to conduct a Routine Port State Control Exam on the vessel. *Tr., p. 55*. As a result of these telephone conversations, Inagaki decided to direct Coast Guard officials to inspect the *Pacific Ruby*.[2]  *Tr., p. 63*.

Inagaki informed Stephen Mills about the calls.[3] During a briefing, Mills was informed that a crew member of the *Pacific Ruby* had reported a possible oily water discharge. *Tr., p. 15*. Mills was asked to conduct a basic Non-priority Vessel Exam upon the ship. *Id.* Mills was also told not to tip off the crew that a fellow crew member had reported the matter to the Coast Guard. *Id.* The Port State Control Examination was conducted during the afternoon hours of September 15, 2005 by Mills, Lt. Lisa Wall, and Lt. Jr. Grade Daniel Gonzales.[4] *Tr., p. 15, 27*.

Upon boarding the ship, Mills and the Coast Guard officers introduced themselves to the Captain of the *Pacific Ruby* and explained the scope of the examination. *Tr., p. 16*. This included a review of documents and inspection of the engineering spaces. *Id.* Mills informed the Captain and other crew members present that he was there to conduct a Non-Priority Vessel Examination. *Tr., p. 30*. The Captain and the crew were not informed that of any intention of the boarding party to search for evidence of criminal violations.[5] *Tr., pp. 31 - 32*.

Mills examined the ship's records and inspected the engineering spaces. *Tr., p. 17*. Mills

---

[2] The *Pacific Ruby* was not otherwise due or scheduled for a safety inspection. *Tr., pp. 27, 32*.

[3] At the time Mills was a civilian employee of the Coast Guard and was Inagaki's subordinate. *Tr., p. 14*. Mills also testified at the suppression hearing.

[4] A Port State Control Examination is an inspection performed on foreign flagged vessels to ensure compliance with international laws and treaties and that they are able to conduct commerce in the United States. *Tr., p. 14*. Mills estimated that he has conducted hundreds of these examinations. *Tr., p. 14*.

[5] Mills testified that he was not conducting a criminal investigation, but was merely conducting an inspection to ensure that equipment aboard the *Pacific Ruby* was working properly. *Tr., pp. 37 - 38*.

personally reviewed the Oil Record Book.[6]  *Id.*  Mills testified that the records reviewed were standard records commonly reviewed by the Coast Guard.  *Tr., pp. 16 - 17.*  As part of the inspection, Mills went to the engine room and inspected equipment he expected to be involved in a situation involving an oily water discharge.  *Tr., p. 34.*  During the inspection of the engine spaces, no deficiencies were noted with the oily water separator. *Tr., p. 17.*  The inspection team did not venture into private crew areas and did not examine or review anything outside the scope of a Port State Control Exam.  *Tr., pp. 17 - 18, 36.*  After the inspection the team proceeded to the Captain's cabin where they endorsed the certificate of compliance, issued the Port State Control Boarding Report, and then departed the ship.[7]  *Tr., p. 18.*

Defendant OSG's Motion and the Government's Response

Defendant OSG complains that the Coast Guard's boarding and administrative inspection/search was a "pretext" search for evidence conducted under the auspices of a Random Non-Priority Vessel (NPV) Safety Exam.  *See OSG's Motion to Suppress, p. 2.*  OSG contends that, under the circumstances, the Coast Guard was required to obtain OSG's consent or a search warrant.  *OSG's motion, p. 3.*

The Government responds that OSG had no reasonable expectation of privacy in the ship's records that are required to be maintained and available for inspection; that the Coast Guard had search authority under 14 U.S.C. § 89(a), 33 U.S.C. § 1901, *et seq.*, and 33 C.F.R. § 151.23.

---

[6]   The presentation of the Oil Record Book forms the basis of the charge set forth in Count II of the Second Superseding Indictment.

[7]   At the hearing, the Court admitted various documents concerning the inspection of the *Pacific Ruby* into evidence.  *Tr., p. 20.*  These include *Govt. Ex. #2* (Port State Control Report of Inspection); *Govt. Ex. #3* (Certificate of Compliance); *Govt. Ex. #4* (Activity Summary Report); *Govt. Ex. #5* (Tank Ship Exam); and *Govt. Ex. #6* (Vessel Critical Profile).

Finally, the Government argues that the inspection was not conducted under a pretext, however, even if it was courts have made it clear that the subjective intent of the Coast Guard officers is irrelevant. *See Government's Response to the Motion to Suppress* [Clerk's doc. #79].

On September 21, 2006, the Court conducted a hearing on the suppression motion in the manner and form mandated by the Federal Rules of Criminal Procedure. Having heard the evidence and for the reasons set forth herein, the Court recommends that the motion be denied.

**B.     Legal Analysis**

There is no serious dispute as to whether the Coast Guard had general or specific authority to board the *M/T Pacific Ruby* on September 15, 2006. The Coast Guard's general authority is provided by Title 14, United States Code, Section 89(a), which states as follows:

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board and vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

14 U.S.C. § 89(a). In addition, under relevant federal regulations, the Coast Guard had specific authority to board the *Pacific Ruby* pursuant to 33 C.F.R. § 151.23. That regulation provides, in relevant part:

> (a) While at port or terminal under the jurisdiction of the United States, a ship is subject to inspection by the Coast Guard -

\*\*\*

     (2) To determine that evidence of compliance with MARPOL 73/78, as required by § 151.21 is on board and that the condition of the ship and its equipment corresponds substantially with the particulars of this evidence of compliance;

     (3) To determine whether a ship has been operating in accordance with and has not discharged any oil or oily mixtures in violation of the provisions of MARPOL 73/78 or this subchapter;

\*\*\*

     (b) A ship that does not comply with the requirements ... of this chapter, or where the condition of the ship or its equipment does not substantially agree with the particulars of ... required documentation, may be detained ...

     (c) An inspection under this section may include an examination of the Oil Record Book, the oil content meter continuous records, and a general examination of the ship. . . .

33 C.F.R. § 151.23 (2006). Further, a ship must fully maintain an Oil Record Book in which all overboard discharges must be recorded. 33 C.F.R. § 151.25. The Oil Record Book must be kept in a place so as to be readily available for inspection at all reasonable times. 33 C.F.R. § 151.25(i).

<u>Did OSG have a reasonable expectation of privacy
in the areas inspected by the boarding team?</u>

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches ans seizures." *Whren v. United States,* 517 U.S. 806, 809, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). An individual's Fourth Amendment right to be free from unreasonable searches is implicated when he or she (1) has "manifested a subjective expectation of privacy" in the place searched, which (2) "society accepts as objectively reasonable." *California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). The Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise illegitimate. *New Jersey v. T.R.O.,* 469 U.S. 325, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). "To receive the protection of the Fourth Amendment, an expectation of

privacy must be one that society is prepared to recognize as legitimate." *Id.* Quoting *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). "The requirement for a justifiable expectation of privacy is two-fold. The defendant must show an actual or subjective expectation of privacy in the area searched and the expectation must be one that "society is prepared to recognize as 'reasonable.'" *Hudson v. Palmer,* 104 S.Ct. at 3199 (quoting *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)(Harlan, J., concurring)).

The standard which defines privacy interests at sea may be more restrictive than those on land. *United States v. Lopez*, 761 F.2d 632, 635 (11th Cir. 1985). "The heavy overlay of maritime law and the long practice of regulatory stops, inspections and searches by Customs officers further diminish the privacy interests of sailors." *United States v. Herrera,* 711 F.2d 1546, 1553 (11th Cir. 1983). "It is not sufficient, for example, that a sailor have the right to exclude others from a ship in order to have a legitimate interest of privacy, because a Coast Guard officer may board without permission to conduct a safety and document search and gain access to all common areas of a boat." *Lopez*, 761 F.2d at 653. The Fifth Circuit Court of Appeals has held that neither the captain nor the crew has a legitimate expectation of privacy in an area which is subject to the common access of those legitimately aboard the vessel. *United States v. Freeman*, 660 F.2d. 1030, 1034 (5th Cir. Unit B 1981), *cert. denied* 459 U.S. 823 (1982).

Such common areas have been held to include cargo holds, (*United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980)); ice holds, (*United States v. DeWeese*, 632 F.2d 1267 (5th Cir. 1980), *cert. denied* 454 U.S. 878 (1981)); and engine rooms, (*United States v. Stuart-Caballero*, 686 F.2d 890 (11th Cir. 1982), *cert. denied*, 459 U.S. 1209 (1983)). This does not mean, however, that a sailor lacks an expectation of privacy in any area of a ship; including living and sleeping quarters of the

crew, (*United States v. Whitmire,* 595 F.2d 1303, 1312 (5th Cir. 1979), *cert. denied* 448 U.S. 906 (1980)), and private spaces such as dufflebags and footlockers, (*United States v. DeWeese, supra,* 632 F.2d at 1271). Those have been held to be sufficiently private as to confer Fourth Amendment standing upon those with dominion over them when they are subjected to search. *See Lopez,* 761 F.2d at 635-36. Further, there is no reasonable expectation of privacy protected by the Fourth Amendment in an area where the Coast Guard has authority to go, regardless of the subjective expectations or intent of the boarding party. *United States v. Willis*, 639 F.2d 1335, 1337 (5th Cir. Unit A 1981).

As stated above, Mills examined the ship's records, inspected the engineering spaces and reviewed the Oil Record Book. The Government's testimony established that the inspection team did not venture into private crew areas and did not examine or review anything outside the scope of a Port State Control Exam. OSG apparently does not contend that any inspection (including the inspection of the Oil Record Book) or search extended into private areas where a reasonable expectation of privacy may lie. Even if the boarding team did venture into the crew's private areas, it would be difficult to conceive how OSG, as the corporate owner of the vessel, would have a reasonable expectation of privacy in those specific areas. Therefore, this Court finds that OSG had no reasonable expectation of privacy in the areas inspected or searched by the boarding team and their motion to suppress should be denied in that regard.

<u>Was the inspection by the boarding party a "pretext" search prohibited by the Fourth Amendment?</u>

OSG argues that the Coast Guard's boarding of the *M/T Pacific Ruby* was a pretext search in that the crew may have been informed that it was a Random Non-Priority Vessel Exam and was not informed that the Coast Guard suspected an illegal discharge.

The Fifth Circuit has held on numerous occasions that the Coast Guard's plenary authority under Section 89(a) "to stop and board American vessels on the high seas to inspect for safety, documentation, and obvious customs and narcotics violations [is] reasonable within the meaning of the Fourth Amendment." *United States v. DeWeese,* 632 F.2d 1267, 1269 (5th Cir. 1980), *cert. denied* 454 U.S. 878 (1981); *see also United States v. Jonas*, 639 F.2d 200, 202 (5th Cir. Unit B 1981). These inspections may be conducted in the complete absence of suspicion of criminal activity. *DeWeese,* 632 F.2d at 1269; *United States v. Williams,* 617 F.2d 1063, 1075 (5th Cir. 1980)(en banc).

The Coast Guard's exercise of its duties to carry out a vessel inspection in a safe and proper manner is considered to be a limited intrusion that is reasonable under the Fourth Amendment. *United States v. Villamonte-Marquez,* 462 U.S. 579, 588, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). While the inspections conducted by the Coast Guard are administrative in nature, they are not covered by the general administrative search exception to the Fourth Amendment warrant requirement. *United States v. Royal Caribbean Cruises, Ltd.,* 24 F. Supp.2d 155, 164 (D.P.R. 1997); *see also Michigan v. Clifford*, 464 U.S. 287, 291-92 (1984); *Michigan v. Tyler,* 436 U.S. 499, 511-12 (1978). Rather, Coast Guard searches are covered under the rubric of searches on the high seas or in United States territorial waters and fall under the regulatory rubric directed to safety inspections and ships. That criminal activity might be suspected is immaterial to the issue of the reasonableness *vel non* of the search. *Royal Caribbean Cruises, Ltd.,* 24 F.Supp.2d at 164; *see United States v. Villamonte-Marquez,* 462 U.S. at 584.

In *Whren v. United States*[8], the United States Supreme Court addressed the issue of whether

---

[8] 517 U.S. 806.

the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. In holding that an officer's subjective intention is irrelevant, the Supreme Court noted that in *Villamonte-Marquez,* "we held that an otherwise valid warrantless boarding of a vessel by customs officials was not rendered invalid 'because the customs officers were accompanied by a Louisiana state policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marihuana.' We <u>flatly</u> <u>dismissed</u> the idea that an ulterior motive might serve to strip the agents of their legal justification." *Whren*, 517 U.S. at 812, 116 S.Ct. at 1774 (emphasis added). The rationale is, of course, is obvious. There is little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers. *Villamonte-Marquez,* 462 U.S. at 584 n. 3, 103 S.Ct. 2573.

It is difficult to conceive how the Coast Guard's actions in this matter amount to a pretext search.[9] The Coast Guard has statutory authority to board a vessel "for the prevention, detection, and suppression of violations of laws of the United States". 14 U.S.C. § 89(a). The Coast Guard had clear authority to board the *Pacific Ruby* to examine equipment and review documents relating to discharges and other issues relating to the pollution equipment on board. Their purpose in boarding the vessel was to, in fact, examine that equipment and those related documents. The fact that they informed the Captain and crew that they were there to conduct a Non-Priority Vessel (NPV) Safety Exam or a "Random" Non-Priority Vessel (NPV) Safety Exam does not, in this Court's view, make this search or inspection pre-textual. In addition, there is no authority for the

---

[9] This is not a situation such as where a police officer initiates a traffic stop (arguably pre-textual, i.e. under the guise of a traffic violation) for the specific purpose of conducting a narcotics investigation. Here, the Coast Guard was conducting a standard inspection that it had the clear legal authority to conduct. Further, as discussed herein, the type of inspection at issue is done regularly by the Coast Guard for the true purpose of reviewing records, international certificates, documentation, and checking for compliance with international law. *See Mills' Testimony, Tr. at 17.*

proposition that the Coast Guard had a duty to disclose any of their suspicions that a crew member may have committed a crime before boarding and conducting an inspection under the relevant statutes. It is conceivable that such a disclosure, in some circumstances, could cause repercussions for the individuals on board the vessel who provided information to the Coast Guard.

In conclusion, if OSG did indeed have a reasonable expectation of privacy in the common areas of the ship, this Court finds that the inspection or search conducted by the Coast Guard on board the *Pacific Ruby* on September 15, 2005 was not pretextual. Further, even assuming, *arguendo* that the search was pretextual, under *Villamonte-Marquez* and the corresponding precent cited above, the inspection was permissible under the Fourth Amendment.

### C.     Conclusion and Recommendation of the Court

Accordingly, having considered the argument and evidence presented, and based upon the findings of fact and conclusions of law stated herein, the undersigned magistrate recommends that the District Court deny *Defendant Overseas Shipholding Group, Inc's Motion to Suppress Evidence Seized and Derived From September 15, 2005 Pretext Search* [Clerk's doc. #62].

### D.     Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C), all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within ten (10) days of receipt of this report. Failure to file specific, written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within ten (10) days after service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and recommendations, and from appellate review of factual findings and legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v.*

*Arn*, 474 U.S. 140, 155 (1985); *Douglass v. United Serv. Auto. Ass'n.,* 79 F.3d 1415 (5th Cir. 1996) (*en banc*); 28 U.S.C. § 636(b)(1). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir. 1983); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).

**SIGNED this the 4th day of October, 2006.**

_____
KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE